UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| 8103 TAFT, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:16 CV 319 |
| | ) |
| BP PRODUCTS NORTH | ) |
| AMERICA, INC., | ) |
| | ) |
| Defendant. | ) |

**OPINION and ORDER**

This matter is before the court on defendant BP Products North America, Inc.'s motion for summary judgment. (DE # 27.) For the reasons identified below, defendant's motion will be granted.

**I.    BACKGROUND**

Plaintiff 8103 Taft, LLC ("Taft"), is a limited liability company with its principle place of business in Indiana.[1] Taft has two members, Nick Kikalos, Jr. and Elizabeth Kikalos, both of whom reside in Indiana. (*Id.*) Defendant BP Products North America, Inc. ("BP") is a Maryland corporation with its principle place of business in Illinois. (DE # 1 at 1.) The amount in controversy exceeds $75,000. (DE # 5.) Thus, this court may exercise diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

---

[1] Taft's business registration is available through Indiana's website, *available at* https://bsd.sos.in.gov/PublicBusinessSearch/BusinessInformation?businessId=860131&businessType=Domestic%20Limited%20Liability%20Company&isSeries=False. *See also Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011) (courts may take judicial notice of information on government websites).

The following facts are undisputed. In June 2003, BP sold property located at 8103 Taft Street, Merrillville, Indiana ("the Property") to Demetrios Angelos and Spiros Angelos (the "Angeloses") via a Special Warranty Deed ("2003 Deed"). (DE # 29-6.) The Property was previously owned by a subsidiary of BP and operated as a gas station. (DE # 29-4 at 4-5; DE # 29-6 at 1.) In February 2003, prior to the sale, BP removed the underground storage tank system and conducted some environmental remediation of the Property. (DE # 29-3 at 4, 7-8.)

The 2003 Deed contains restrictions on land use and waivers for existing contamination of the Property. (DE # 29-6.) The 2003 Deed states, in relevant part:

1. <u>WARRANTY.</u> TO HAVE AND TO HOLD the above granted and bargained Property . . . unto the Grantee and the heirs, devisees, legal representatives, successors and assigns of Grantee, as the case may be, forever, SUBJECT, however to: . . . (e) the restrictions, covenants and representations set forth herein.

3. a. <u>Disclaimer.</u> Grantee acknowledges that the Property has been used as a service station or for related purposes for the storage, sale, transfer or distribution of motor vehicle fuels, petroleum products or derivatives containing hydrocarbons . . . Grantee acknowledges and agrees that **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE PROPERTY IS HEREBY CONVEYED AND ACCEPTED IN ITS "AS IS, WHERE IS" CONDITION. . . . EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, GRANTEE DOES HEREBY WAIVE RELEASE AND DISCHARGE THE GRANTOR ENTITIES FROM AND AGAINST ALL LOSSES, AS DEFINED BELOW, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE PROPERTY OR THE CONDITION THEREOF.**

   b. <u>Hyrocarbons.</u> . . . Except as may be specifically be (sic) provided in the Soil Management Plan which has been approved by Grantor, or any other written contractual relationship between the parties,

> Grantor shall not be obligated to pay any cost related to the excavation and/or development of the Property. Grantee and the other Grantee Parties shall be solely responsible for any and all soil excavation, hauling, transportation, and disposal costs pursuant to the Soil Management Plan.
>
> c. <u>Other Contamination.</u> Grantee acknowledges that there may be Hazardous Materials, other than Hydocarbons, existing on or migrating from the Property as of the Closing Date. . . Grantee does hereby waive, release and discharge Grantor . . . from and against all actions or causes of action at law or in equity . . . directly or indirectly arising out of or relating to the Other Contamination or the performance of any Remediation therefor.
>
> d. <u>Future Contamination.</u> Grantee acknowledges that there may be Hazardous Materials which are threatened to be or are spilled, leaking, migrated or otherwise discharged onto, into or from the Property after the Closing Date. . . Grantee does hereby agree to assume and be responsible for, and does hereby waive, release and discharge . . . the Grantor Entities from and against all Losses directly or indirectly arising out of or relating to Future Contamination or the performance of any Remediation therefor.
>
> 4. <u>EXPOSURE RESTRICTION.</u> . . . [T]he Property is hereby conveyed by Grantor and accepted by Grantee subject to a restriction and covenant prohibiting . . . the use of the Property in whole or in party, directly or indirectly, for: (a) any use or occupancy (if the Property is used or occupied at all) for other than non-residential, commercial and/or industrial purposes[.]
>
> 5. <u>MISCELLANEOUS.</u> The terms and provisions of this Deed shall run with the Property and each portion thereof and shall be binding upon and inure to the benefit of the parties, their respective heirs, devisees, legal representatives successors and assigns, as the case may be and any other person or entity expressly noted herein.

(*Id.* (emphasis in original).) The 2003 Deed was recorded in the Office of the Recorder of Lake County, Indiana. (*Id.* at 7.)

In December 2003, an environmental consulting firm hired by Nick Kikalos

3

("Kikalos") issued a detailed assessment of the existing contamination on the Property. (DE # 29-2; DE # 29-10 at 6.) The consultant's report also identified limitations on the use of the Property based on the contamination levels and existing State regulations. (DE # 29-10.)

In February 2004, Trust No. 5324 ("the Trust") purchased the Property from the Angeloses by a Special Limited Warranty Deed ("2004 Deed"). (DE # 29-7.) The 2004 Deed specifically stated that the property transfer was "subject to the provisions and restrictions of record." (*Id.*) Kikalos is both a beneficiary of the Trust and a partner of Taft. (DE # 29-1 at 1; DE # 29-2 at 6.)

Following the removal of the underground storage tanks, the Indiana Department of Environmental Management ("IDEM") and BP (through its consultant) investigated the extent of the contamination on the Property. (DE # 29-5; DE # 29-11.) The investigation revealed several affected areas on the Property. BP's consultant issued a report detailing the areas of contamination, the contaminants discovered, and the levels of contamination present in the affected areas. (DE # 29-11; DE # 29-12.)

In 2008, IDEM approved BP's plan to close the investigation by implementing an environmental restrictive covenant ("ERC") on the Property. (DE # 29-12.) The ERC identifies the existing contamination and imposes additional land use restrictions. (DE # 29-8.) BP provided the ERC to the Trust, and the Trust executed the ERC in May 2008. (*Id.*) The ERC bound both the Trust, as the owner of the Property, as well as all future owners of the Property, through a provision that the ERC would run with the

land. (*Id.*) The ERC was publically filed with the results of the contamination investigation. (*Id.*)

In November 2008, Kikalos hired an engineering firm to begin building on the Property. (DE # 29-2 at 34.) In 2009, the engineering firm contacted IDEM and Kikalos regarding the proposed property development and potential soil excavation issues on the Property. (DE # 1 at 1; DE # 29-13; DE # 29-14.) As of April 2010, the engineering firm had determined that building on the south end of the Property was likely to require the least amount of soil remediation, although it would require that an abandoned septic field be removed. (DE # 29-15.)

In June 2010, the Trust transferred title of the Property to Taft. (DE # 29-9.) The Property transfer was again "Subject to: Covenants, easements, restrictions of record. . . .," including the 2003 Deed and the ERC. (*Id.*)

In May 2016, Taft filed its complaint, alleging a mix of common law and statutory claims. (DE # 5.) It claims that BP is liable for negligently contaminating the soil on the Property. (*Id.* at 6.) It also alleges that BP fraudulently induced Taft to sign the ERC and fraudulently represented that the land was ready for commercial development when it knew that the land required further remediation. (*Id.* at 8.) Finally, it alleges that BP is liable for cleanup costs pursuant to the Indiana Underground Storage Tank statute (Ind. Code 13-23, *et seq.*) and the Indiana Environmental Legal Actions statute (Ind. Code, 13-30 *et seq.*). (*Id.* at 6.)

In its brief in support of its motion for summary judgment, BP argues that there

are six reasons it is entitled to judgment as a matter of law. (DE # 28 at 2.) First, the waiver of liability contained in the chain of title released BP from all of Taft's present claims. (*Id.*) Second, Taft's fraud and negligence claims are barred by the applicable statute of limitations. (*Id.*) Third, there is insufficient evidence to establish a fraud claim because there was no false statement and no reasonable reliance. (*Id.*) Fourth, Indiana does not recognize a duty between prior and current owners of property, and therefore Taft's negligence claim fails as a matter of law. (*Id.*) Fifth, Taft did not engage in a removal, remediation, or corrective action under the Indiana statutes. (*Id.*) Sixth, there is no evidence that Taft disposed of any contaminated soil, and thus there is no evidence of any injury. (*Id.* at 3.)

This court finds that Taft's common law claims are time-barred and its statutory claims are waived. Therefore, the court need not address BP's remaining arguments.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone,

6

but must present proof in support of its position. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

### III. ANALYSIS

#### A. *Taft's Fraud and Negligence Claims are Untimely*

In Indiana, there is a six-year statute of limitations on fraud claims and claims relating to damage to property. Ind. Code § 34-11-2-7. "Under Indiana's discovery rule, a cause of action accrues, and the limitation period begins to run, when a claimant knows or in the exercise of ordinary diligence should have known of the injury." *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009). "For an action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred." *Id.*

7

"Indiana adheres to the rule that 'third parties are usually held accountable for the time running against their predecessors in interest.'" *Id.* at 1279 (internal citation omitted). Thus, in a claim for damage to property, a plaintiff's cause of action may accrue before the plaintiff takes ownership of the property. *See id.* (plaintiff's common law claims regarding contamination of land began to accrue at the time of discovery of contamination through its environmental consultant's report, even though plaintiff did not yet own the property).

Here, Taft filed its complaint on May 24, 2016. (DE # 5.) Thus, any common law action that accrued before May 24, 2010, is time-barred.[2]

Taft's fraud and negligence claims are plainly untimely. It knew as early as 2003 that the Property was contaminated. In 2003, Kikalos' environmental consultant provided a detailed report regarding the existing contamination. (DE # 29-2; DE # 29-10 at 6-30.) The report noted that development on the Property would likely be restricted to commercial development only. (DE # 29-10 at 6.) Therefore, by the time the Trust purchased the Property in 2004, it was already aware of the contamination.

In 2008, the Trust executed the ERC, which contained additional information

---

[2] Taft failed to respond to BP's argument that its fraud and negligence claims are untimely, instead arguing that its statutory claims are timely. Yet, BP does not argue that the statutory claims are untimely. Taft's failure to respond to BP's argument is a waiver of any argument it may have had in response to BP's statute of limitations argument. *See Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017) ("this court has 'long refused to consider arguments that were not presented to the district court in response to summary judgment motions.'" (quoting *Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999)).

8

regarding contamination on the Property. (DE # 29-8.) During this time, Kikalos hired an engineering firm to prepare plans to build on the Property. (DE # 29-2 at 34.) The engineering firm acknowledged the existing contamination and developed plans to build on the Property with as little remediation as possible. (DE # 29-13; DE # 29-14.) In its April 2010 letter to IDEM, the firm set forth its plan to remove the septic field and related appurtenances. (DE # 29-15.)

Thus, Kikalos was aware of the contamination of the Property well before May 2010. As a beneficiary of the Trust and a partner of Taft, Kikalos' knowledge is attributable to Taft. *See* Ind. Code § 23-18-3-2 ("[N]otice to a member of a matter relating to the business or affairs of the limited liability company . . . is notice to the limited liability company." ). Taft's common law claims accrued prior to May 2010, and therefore these claims are time-barred.

B.  *Taft's Statutory Claims*

Taft argues that it is entitled to recover damages pursuant to Indiana's Underground Storage Tank statute and Environmental Legal Actions statute. While these statutes do provide a means to obtain contribution for the costs of environmental remediation, the statutes note that any contract allocating costs or responsibility for remediation is controlling. *See* Ind. Code § 13-23-13-10 ("This section does not bar an agreement to: (1) insure; (2) hold harmless; or (3) indemnify; a party to an agreement for any liability under this article."); Ind. Code § 13-30-9-3 ("Notwithstanding subsection (a), if parties have entered into a contract that allocates the costs or responsibility for the

9

removal or remedial action, the terms of the contract control the allocation of costs between the parties to the contract.").

Here, the 2003 Deed explicitly released BP from liability from any existing and future contamination or remediation of the Property. The Deed states: "**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, GRANTEE DOES HEREBY WAIVE, RELEASE AND DISCHARGE THE GRANTOR ENTITIES FROM AND AGAINST ALL LOSSES AS DEFINED BELOW, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE PROPERTY OR THE CONDITION THEREOF**." (DE # 29-6 (emphasis in original).) Additionally, "Grantee does hereby waive, release and discharge Grantor . . . from and against all actions or causes of action at law or in equity . . . directly or indirectly arising out of or relating to the Other Contamination or the performance of any Remediation therefor." (*Id.*) Finally, "Grantee does hereby agree to assume and be responsible for, and does hereby waive, release and discharge . . . the Grantor Entities from and against all Losses directly or indirectly arising out of or relating to Future Contamination or the performance of any Remediation therefor." (*Id.*)

These releases transfer responsibility for future remediation to the purchaser of the Property. These provisions supersede any right to contribution Taft might otherwise have had under the Indiana statutes. *See W. Ohio Pizza, Inc. v. Clark Oil & Ref. Corp.*, 704 N.E.2d 1086 (Ind. Ct. App. 1999) (plaintiff was barred from seeking contribution under Indiana law for costs of remediating leaking underground storage tanks where the

property was sold "as is" and purchase agreement unambiguously expressed parties' intent to transfer liability for costs of remediation to purchaser).

These releases are applicable to Taft, even though it was not a party to the 2003 Deed, because the releases run with the land. Typically, "[c]ontractual obligations are personal in nature and privity of contract is essential for the establishment of such liability. However, Indiana recognizes an exception to the privity of contract requirement: it is called privity of estate. In Indiana, the obligations of a contract are imposed upon persons who stand in privity of estate with the original covenantor as successive grantees." *Columbia Club, Inc. v. Am. Fletcher Realty Corp.*, 720 N.E.2d 411, 417 (Ind. Ct. App. 1999) (internal citations omitted). "Covenants are either personal, enforceable only by the original parties to an agreement, or they 'run with the land.' When covenants run with the land, they may be enforced against remote grantees." *Id.* at 418. A covenant will run with the land if: "(1) the covenantor and covenantee intend it to run; (2) the covenant touches and concerns the land; and (3) there is privity of estate between subsequent grantees of the original covenantor and covenantee." *Id.*

The 2003 Deed meets all three elements of a covenant that runs with the land. First, the 2003 Deed unambiguously demonstrates the parties' intent that the covenant runs with the land. The parties' agreement explicitly states, "[t]he terms and provisions of this Deed shall run with the Property and each portion thereof and shall be binding upon and inure to the benefit of the parties, their respective heirs, devisees, legal representatives successors and assigns, as the case may be and any other person or

11

entity expressly noted herein." (DE # 29-6.) This provision applies to the whole of the agreement, including the release of liability.

The 2003 Deed also satisfies the second condition because it is a covenant that "touches and concerns the land." The 2003 Deed places restrictions on the use of the land, regulates access to the land for remediation, and releases BP from liability related to contamination of the land.

Finally, there is privity of estate between the subsequent grantee and the original coventor and coventee. "Under Indiana property law, there are two types of privity, horizontal privity and vertical privity." *Columbia Club, Inc.*, 720 N.E.2d at 421. "Vertical privity is the most easily satisfied form of privity of estate. It is established where the party seeking to enforce the covenant and the party against whom it is to be enforced are successors in title to the property of the covenantee and covenantor respectively." *Id.* Taft purchased the Property from the Trust, who purchased it from the Angeloses, who were party to the original agreement. Taft is a successor in title to the Property, and therefore vertical privity exists. Moreover, the Property was transferred to Taft "[s]ubject to: the covenants, easements, and restrictions of record" – which included the 2003 Deed. (DE # 29-9.) Thus, when Taft took possession of the Property, it did so subject to the terms and release contained in the 2003 Deed. The 2003 Deed runs with the land and the waiver of liability serves to bar Taft's present claims against BP.

Taft argues that the "[c]ovenant and deed terms required BP to provide a property that was ready for commercial use . . . The relevant terms specifically state that

12

the property can be used 'as is' for commercial development." (DE # 33 at 7.) This statement has no basis in fact. The 2003 Deed explicitly states that no warranty is made regarding the fitness of the Property for a particular purpose:

> **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE PROPERTY IS HEREBY CONVEYED AND ACCEPTED IN ITS "AS IS, WHERE IS" CONDITION ON THE CLOSING DATE, WITH NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ITS HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR USE OR PURPOSE, CONDITION, DESIGN, OPERATION, CAPACITY OR OTHERWISE.**

(DE # 29-6 at 2 (emphasis in original).) While the Deed stated that the land could not be used for non-commercial purposes, the Deed did not make any warranty that the land could be used for commercial purposes without further remediation.

Taft also argues that the release in the 2003 Deed is limited to a release from "harm arising from contamination other than Hydrocarbons. That is how 'losses' is defined in the deed." (DE # 33 at 7.) Again, this is incorrect. The term "losses" is defined as "all actions or causes of action at law or in equity, claims, demands, costs, expenses (including reasonable attorneys' fees), obligations, losses, damages (excluding business interruption and other consequential damages), payments, liabilities, liens, fines and penalties." (*Id.* at 3.) The definition does not exclude losses caused by contamination from hydrocarbons, and thus the release is not limited in the manner Taft suggests.

The 2003 Deed released BP from precisely the type of liability Taft now seeks to impose. The release runs with the land, and precludes Taft's claims in this case. Therefore, BP is entitled to judgment in its favor as a matter of law.

13

C. *Motion to Strike*

One final matter remains before this court. BP has filed a motion to strike portions of Nick Kikalos' affidavit, submitted as part of Taft's response, on the basis that the paragraphs at issue contain hearsay, contradict his earlier testimony, and are based on speculation. (DE # 34.)

Motions to strike are usually only granted in circumstances where the contested evidence causes prejudice to the moving party. *Kuntzman v. Wal-Mart*, 673 F.Supp. 2d 690, 695 (N.D. Ind. 2009). That is not the case here. The court did not rely on Kikalos' affidavit in resolving BP's motion for summary judgment. Accordingly, the motion to strike will be denied as moot.

The court does, however, direct plaintiff's counsel to review Local Rule 56-1(b)(2). This rule requires a party opposing a motion for summary judgment to include a section labeled "Statement of Genuine Disputes" that "identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary." N.D. Ind. L.R. 56-1. While plaintiff's response brief contains a section with this title, it is comprised entirely of argument. In future, counsel should limit this section to the identification of facts that counsel believes preclude summary judgment. Failure to comply with the local rules in the future may result in counsel's briefs being stricken.

IV. **CONCLUSION**

For these reasons, the court **GRANTS** defendant's motion for summary judgment (DE # 27) and **DENIES** defendant's motion to strike (DE # 34) as moot. The

Clerk is **DIRECTED TO ENTER FINAL JUDGMENT** stating:

> Judgment is entered in favor of defendant BP Products North America, Inc., and against plaintiff 8103 Taft, LLC, who shall take nothing by way of its complaint.

**SO ORDERED.**

Date: August 6, 2018

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT